# EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (the "**Agreement**") is made and entered into as of this 8th day of March 2022 ("**Effective Date**") by and between Chugach Electric Association, Inc. (the "**Association**"), acting through its Board of Directors ("**Board**"), and Hal Halpern ("**Executive**") (individually, a "**Party**" or collectively, the "**Parties**").

WHEREAS, the Association desires to employ Executive as Chief Executive Officer ("**CEO**") of the Association on the terms and condition set forth herein;

WHEREAS, Executive desires to be employed by the Association on such terms and conditions;

NOW, THEREFORE, in consideration of the mutual covenants, promises, and obligations herein contained, the Parties agree as follows:

1. Employment and Term. The Association shall employ Executive as CEO of the Association and Executive accepts employment with the Association, upon the terms and conditions set forth in this Agreement. The term of Executive's employment shall commence on the Effective Date and shall continue until the third anniversary thereof, unless terminated earlier pursuant to Section 4 of this Agreement; provided that, on such third anniversary of the Effective Date and each annual anniversary thereafter (such date and each annual anniversary thereof, a "**Renewal Date**"), the Agreement shall be deemed to be automatically extended, upon the same terms and conditions, for successive periods of one year, unless either party provides written notice of its intention not to extend the term of the Agreement at least 90 days' prior to the applicable Renewal Date. The period during which the Executive is employed by the Company hereunder is hereinafter referred to as the "**Term.**"

2. Position and Duties.

(a) During his employment, Executive shall be responsible for the management of the affairs of the Association and shall have such duties, responsibilities, and authority consistent with the Executive's position as shall be determined from time to time by the Board in its sole discretion. The Executive shall be subject to a performance review by the Board on at least an annual basis.

(b) Executive shall report directly to and be accountable to the Board. Executive shall devote his best efforts and his full business time and attention to the business and affairs of the Association, to performing Executive's duties under this Agreement, and to promoting the Association's interests and welfare, and shall not be employed by or engaged in the management of any other business, profession, or occupation for compensation or otherwise that would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Board. Notwithstanding the foregoing, the Executive will be permitted, with the prior written consent of the Board (which consent can be withheld by the Board in its sole discretion), to act or serve as a director, trustee, committee member, or principal of any type of business, civic, or charitable organization as long as such activities are disclosed in writing to the Board, and such activities do not interfere with the performance of the Executive's duties and responsibilities to the Association as provided hereunder.

Ex. 1, p. 1

1

(c) Executive's principal place of employment shall be the Association's executive office building currently located in Anchorage, Alaska; provided that, Executive may be required to travel on Association business from time to time during the Term.

3. Compensation

(a) Base Salary. Executive shall receive a base annual salary in the gross amount of four hundred ninety-nine thousand dollars (**$499,000**), less applicable withholdings and deductions, which salary shall be payable in regular installments in accordance with the Association's general payroll practices and policies (the "**Base Salary**"). The Base Salary of Executive shall from time to time, but not more frequently than annually, be reviewed by the Board for adjustment, if any, which adjustment shall be in the sole discretion of the Board.

(b) Annual Performance Payment. For each completed fiscal year during the Term, Executive shall be eligible to receive an annual performance payment (a "**Performance Payment**"), of up to 25% of the Executive's Base Salary based upon the satisfactory achievement of annual performance goals established by the Board. The Executive and Board shall work collaboratively in good faith to establish initial performance goals within ninety (90) days of the Effective Date.

(c) Employee Benefits. During the Term, Executive shall be entitled to participate in the Association's standard employee benefit programs for which executives of the Association are generally eligible, including, but not limited to, insurance and health benefits and retirement plan (collectively, "**Benefits**"). Executive recognizes that the Association reserves the right to change the Benefits from time to time and the Association's right to make such changes shall not be restricted by this Agreement.

(d) Annual Leave. Executive shall be entitled to receive five weeks of annual leave in accordance with the Company's policies for executive officers as such policies may exist from time to time.

(e) Relocation Expenses. The Association shall pay or reimburse Executive for documented relocation expenses associated with Executive's relocation to Anchorage, Alaska, ("Relocation Expense"), subject to the following terms and conditions:

(i) The Relocation Expense must be incurred after Executive has accepted employment with the Association and no later than one hundred eighty days following the Effective Date;

(ii) The total Relocation Expense reimbursement shall not exceed eighty-eight thousand dollars ($88,000), less all applicable withholdings and deductions required by law;

(iii) Eligible Relocation Expenses shall include:

a. Reasonable costs related to shipping Executives household goods, furnishings, and personal property to Anchorage, Alaska from Executive's current home.

b. Reasonable and customary closing, broker, and realtor fees associated with the purchase of new home in Anchorage, Alaska, and termination of current residential lease.

c. Reasonable, temporary rental home expense incurred by Executive prior to purchasing a new home in Anchorage, Alaska subject to a maximum rental home expense reimbursement of six (6) months' rent.

d. Reasonable travel expenses for Executive to/from Anchorage, Alaska during the relocation period, subject to a maximum travel expense reimbursement of two thousand five hundred dollars ($2,500).

(iv) The Company will pay Executive a tax gross-up payment in an amount such that, after the payment of all federal and state income taxes on any and all portions of the Relocation Expense reimbursement that are not excludible from such taxes, Executive will be in the same after-tax position as if the entire Relocation Expense reimbursement were excludible from Executive's income for federal and state income tax purposes.

(iv) Executive shall provide the Association with such receipts as necessary to prove the expenses claimed; and

(v) If the Executive terminates his employment without Good Reason or is terminated by the Association for Cause (both as defined below) within one year after the Effective Date, the Executive shall be required to repay the Association the gross amount of any Relocation Expense paid or reimbursed under this Section.

(f) Business Expenses. Executive shall be entitled to reimbursement for reasonable and necessary out-of-pocket expenses incurred in connection with the performance of Executive's duties hereunder in accordance with the Association's expense reimbursement policies and procedures.

(g) Legal Fees Incurred Negotiating the Agreement. The Association shall reimburse Executive for the Executive's reasonable legal fees incurred in negotiating and drafting this Agreement up to a maximum of two-thousand dollars ($2,000).

4. Termination.

(a) The Term and the Executive's employment hereunder may be terminated by either the Association or the Executive at any time and for any reason. On termination of the Executive's employment, the Executive shall be entitled to the compensation and benefits described in this Section 4 and shall have no further rights to any compensation or any other benefits from the Association or any of its affiliates. The date the Agreement is not renewed or the date the Executive is terminated for any reason set forth below shall be the "**Termination Date.**"

(b) Probationary Period. If Executive's employment is terminated without Cause (as defined below) or by Executive for Good Reason (as defined below) within three (3) months from the Effective Date ("**Probationary Period**"), Executive shall be entitled to receive (i) his accrued Base Salary, (ii) the Base Salary, less applicable withholdings and deductions, payable in

3

accordance with the Association's regular payroll practices for six (6) months from the Termination Date, and (iii) accrued, but unused paid leave through the Termination Date, but no other compensation shall be deemed to have accrued or be payable.

(c) <u>Without Cause or For Good Reason.</u> After expiration of the Probationary Period, if Executive's employment is terminated by the Association without Cause (as defined below) or by Executive for Good Reason (as defined below), the Executive shall be entitled to receive his accrued Base Salary and accrued, but unused paid leave through the Termination Date ("**Accrued Amounts**") and subject to the Executive's compliance with Sections 6, 7, 8, and 9 of this Agreement and the Executive's execution of a release of claims in favor of the Association, its affiliates and their respective officers and directors in a form provided by the Company (the "**Release**") Executive shall also receive, after the effective date of the Release, the following:

> (i) the Base Salary, less applicable withholdings and deductions, payable in accordance with the Association's regular payroll practices for twelve (12) months from the Termination Date (the "**Separation Pay**"); provided that, the first installment payment shall include all amounts that would otherwise have been paid to the Executive during the period beginning on the Termination Date and ending on the first payment date if no delay had been imposed for execution of the Release;

> (ii) a payment equal to the product of (A) the Performance Payment, if any, that the Executive would have earned for the fiscal year in which the termination occurs based on achievement of the applicable performance goals for such year and (B) a fraction, the numerator of which is the number of days the Executive was employed by the Association during the year of termination and the denominator of which is the number of days in such year (the "Pro-Rata Performance Payment"). This amount shall be paid no later than two-and-a-half (2 1/2) months following the end of the fiscal year in which the Termination Date occurs; and

> (iii) if the Executive timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Company shall reimburse the Executive for the difference between the monthly COBRA premium paid by the Executive for the Executive and the Executive's dependents and the monthly premium amount paid by similarly situated active executives. Such reimbursement shall be paid to the Executive on the 30th of the month immediately following the month in which the Executive timely remits the premium payment. The Executive shall be eligible to receive such reimbursement until the earliest of: (A) the twelve (12)-month anniversary of the Termination Date; (B) the date the Executive is no longer eligible to receive COBRA continuation coverage; and (C) the date on which the Executive becomes eligible to receive substantially similar coverage from another employer or other source. The Separation Pay, Pro-Rata Performance Payment, and reimbursement of COBRA premiums collectively are referred to as "**Separation Benefits.**"

(d) <u>For Cause or Without Good Reason.</u> If Executive's employment is terminated at any time by the Association for Cause (as defined below) or by Executive without Good Reason (as defined below) or is terminated for non-renewal of the Agreement, Executive shall only be entitled to

4

Ex. 1, p. 4

Case 3:22-cv-00118-HRH    Document 1-1    Filed 05/04/22    Page 4 of 12

receive the Accrued Amounts, and no other compensation shall be deemed to have accrued or be payable.

(e) Death or Disability.

(i) The Executive's employment hereunder shall terminate automatically on the Executive's death during the Term, and the Association may terminate the Executive's employment on account of the Executive's Disability.

(ii) If the Executive's employment is terminated during the Term on account of the Executive's death or Disability, the Executive (or the Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the following:

1. the Accrued Amounts; and

2. a lump sum payment equal to the pro-rata Performance Payment, if any, that the Executive would have earned for the fiscal year in which the Termination Date occurs based on the achievement of applicable performance goals for such year, which shall be payable no later than two-and-a-half (2 1/2) months following the end of the fiscal year in which the Termination Date occurs.

Notwithstanding any other provision contained herein, all payments made in connection with the Executive's Disability shall be provided in a manner which is consistent with federal and state law.

(f) Except as set forth above, all of Executive's rights to benefits and a Performance Payment, if any, hereunder shall cease upon the Termination Date, to the extent consistent with the terms of such benefit plans and as permitted by law. Executive agrees that on the Termination Date, he shall be deemed to have resigned from his position as director, officer or any other position with any of the diversified business interests of the Association.

(g) For purposes of this Agreement, "**Cause**" shall mean (i) failure to perform Executive's duties; (ii) failure to comply with any valid and legal directive of the Board; (iii) embezzlement, misappropriation, or fraud, whether or not related to the Executive's employment with the Association, (iv) the conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony or the commission of any other act involving dishonesty, disloyalty, or misconduct with respect to the Association; (ii) conduct that brings the Association into public disgrace or disrepute; (vii) violation of the Association's written policies or codes of conduct, including written policies related to discrimination, harassment, performance of illegal or unethical activities, and ethical misconduct; (viii) willful unauthorized disclosure of Confidential Information; (ix) knowingly or willingly violating any rules or regulations governing the Association; or (x) breach of or failure of Executive to perform any other provision of this Agreement which is not cured (if capable of being cured) within 15 days after written notice thereof to Executive. Notwithstanding any notice and cure period, the Association has the right to suspend Executive during an investigation and cure period to determine whether to terminate the Executive for Cause, without triggering the right of Executive to terminate the Agreement for Good Reason.

(h) For purposes of this Agreement, "**Good Reason**" shall mean (i) without Executive's consent, a material, adverse change in (A) his title, authority, duties, or responsibilities (other than temporarily while the Executive is physically or mentally incapacitated or as required by applicable law); or (B) the reporting structure applicable to the Executive; (ii) without Executive's consent, a material reduction in his Base Salary, Performance Payment opportunity, and/or Benefits by a greater percentage than an applicable across the board reduction for all similarly situated employees; (iii) without Executive's consent, a required relocation that is more than 100 miles outside the Anchorage, Alaska area; or (iv) any other action or inaction by the Association constituting a material breach of the Agreement. Executive cannot terminate employment for Good Reason unless the Executive has provided written notice to the Association of the existence of the circumstances providing grounds for termination for Good Reason within 90 days of the initial existence of such grounds and the Association has had at least 60 days from the date on which such notice is provided to cure such circumstances. If the Executive does not terminate employment for Good Reason within 180 days after the first occurrence of the applicable grounds, then the Executive will be deemed to have waived the right to terminate for Good Reason with respect to such grounds.

(i) For purposes of this Agreement, "**Disability**" shall mean that Executive is unable to perform his duties hereunder owing to illness or other physical or mental incapacity, with or without reasonable accommodation, and such illness or other incapacity is likely to continue for a period of one hundred eighty (180) days in a three hundred and sixty-five (365)-day period. Executive agrees to submit to an appropriate examination if requested by the Association; provided, however, the Association shall pay for the expenses relating to such examination. Any question as to the existence of the Executive's Disability as to which the Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to the Executive and the Company. If the Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and the Executive shall be final and conclusive for all purposes of this Agreement.

5. Cooperation. The parties agree that certain matters in which Executive will be involved during the Term may necessitate Executive's cooperation in the future. Accordingly, following notice of the termination of Executive's employment for any reason, or otherwise upon the request of the Association, and to the extent reasonably requested by the Association, Executive shall, without additional compensation, reasonably cooperate with the Association in connection with the matters arising out of Executive's employment, including, without limitation, providing information, assistance and training to persons designated by the Association to provide for an orderly transition of Executive's responsibilities in a manner intended to minimize disruption of the Association's business; provided that, to the extent the Association requests Executive's cooperation after he is terminated, the Association shall make reasonable efforts to minimize disruption of Executive's other activities.

6. Confidential Information.

(a) Executive understands and acknowledges that during the Term, he will have access to confidential information of the Association. "**Confidential Information**" includes, but is not

Ex. 1, p. 6

6

Case 3:22-cv-00118-HRH   Document 1-1   Filed 05/04/22   Page 6 of 12

limited to, member information, legal matters, employee information, trade secrets and operations information, which the Association has spent considerable time and resources to develop and is of value to the Association. Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. Confidential Information does not include any such information that is generally available to and known by the public at the time of disclosure to the Executive. During and after his employment, Executive agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Association not having a need to know and authority to know and use the Confidential Information in connection with the business of the Association and, in any event, not to anyone outside of the direct employ of the Association except as required in the performance of Executive's authorized duties or with the prior consent of the Board; and (iii) except as required in the performance of the Executive's authorized duties or with the prior consent of the Board, not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Association. Upon his termination, Executive shall return to the Association all such Confidential Information and not retain any copies. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. This provision shall survive termination of this Agreement for any reason.

(b) <u>Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA")</u>. Notwithstanding any other provision of this Agreement: (i) Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that: (A) is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed under seal in a lawsuit or other proceeding; (ii) if Executive files a lawsuit for retaliation by the Association for reporting a suspected violation of law, Executive may disclose the Company's trade secrets to the Executive's attorney and use the trade secret information in the court proceeding if the Executive: (A) files any document containing trade secrets under seal; and (B) does not disclose trade secrets, except pursuant to court order.

7. <u>Non-Competition</u>. The Executive understands that the nature of the Executive's position gives the Executive access to and knowledge of Confidential Information and places the Executive in a position of trust and confidence with the Association. Because of the Association's legitimate business interest as described herein and the good and valuable consideration offered to the Executive, during the Employment Term and for the period of one year, beginning on the last day of the Executive's employment with the Company (the "**Restricted Period**"), regardless of the reason for the termination and whether employment is terminated at the option of the Executive or the Association, the Executive agrees and covenants not to engage in Prohibited Activity within

the Alaska Railbelt. "**Prohibited Activity**" is activity in which the Executive contributes the Executive's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Association or with any diversified businesses in the Association's territory in which the Association has an ownership interest now or in the future, as allowed by applicable law. Prohibited Activity also includes any activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information. This noncompetition covenant does not prohibit Executive from becoming employed by another rural electrical cooperative outside of the Alaska Railbelt. This non-competition covenant shall survive termination of this Agreement for any reason.

8. Non-Solicitation of Employees. During the Restricted Period, Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Association. This non-solicitation covenant shall survive termination of this Agreement for any reason.

9. Non-Disparagement. The Executive agrees and covenants that the Executive will not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Association or its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties. This **Error! Bookmark not defined.**9 does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. This non-disparagement covenant shall survive termination of this Agreement for any reason.

10. Acknowledgement. Executive acknowledges and agrees that the services to be rendered by Executive to the Association are of a special and unique character; that Executive will obtain knowledge and skill relevant to the Association's industry, methods of doing business and marketing strategies by virtue of his employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Association, and because of the compensation and other benefits provided to Executive, he will not suffer undue hardship by reason of full compliance with the terms and conditions of these provisions.

11. Enforcement. Executive acknowledges and agrees that a breach of any of his obligations under the Agreement, including Sections 6, 7, 8, and 9 would cause irreparable damage to the Association, the exact amount of which would be difficult to determine, and that the remedies at law for any such breach would be inadequate. Accordingly, Executive agrees that in the event he breaches any of such provisions in any material respect and fails to cure such breach, if capable of cure, within 10 days after notice from the Association, the Association shall be entitled to (a) immediately cease and withhold any applicable employee compensation, including any Separation Benefits, not yet paid, to which Executive would otherwise be entitled, subject to a final determination of breach and damages, and (b) obtain specific performance and injunctive and other equitable relief from a court of competent jurisdiction, without posting bond or other security. The

Association's rights and remedies as set forth in this Section are cumulative and are in addition to any other rights and remedies the Association may have at law or in equity.

12. Executive Representations. Executive hereby represents and warrants to the Association that (a) the execution, delivery and performance of this Agreement by Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound, (b) the Executive's acceptance of employment with the Association and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer, and (c) upon the execution and delivery of this Agreement by the Association, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms.

13. No Third-Party Rights. The parties agree that by making this Agreement they do not intend to confer any benefits, privileges, or rights to others. The Agreement is strictly between the parties hereto, subject to the terms of Section 17 below, and it shall not be construed to vest in any other the status of third-party beneficiary.

14. Voluntary and Knowingly. Executive acknowledges that, before executing this Agreement, he has been advised and given the opportunity to consult with counsel and is fully aware of his rights under the law. Executive further acknowledges that he has reviewed this Agreement in its entirety, understands it, and voluntarily executes it.

15. Entire Agreement. This Agreement, including the exhibits hereto, constitutes the complete, final, and exclusive embodiment of the entire agreement between Executive and the Association with regard to the subject matter hereof. This Agreement is entered into without Executive's reliance on any promise or representation, written or oral, made by the Board, the Association or its agents or representatives prior to Executive's acceptance of employment with the Association or during negotiation of this Agreement. The parties expressly acknowledge that this Agreement supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

16. Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by Executive and the Association. No waiver by any Party of any breach by the other Party of any condition or provision of this Agreement to be performed by the other Party shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either Party in exercising any right, power, or privilege under this Agreement operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

17. Successors and Assigns. This Agreement shall bind the heirs, personal representatives, successors, assigns, executors, and administrators of each party, and inure to the benefit of each party, its heirs, successors and assigns. The Association may assign the Association's rights under this Agreement. No other assignment shall be permitted unless it is in writing and signed by both parties.

18. Applicable Law. The parties agree and intend that this Agreement be construed and enforced in accordance with the laws of the State of Alaska

19. Severable. If any provision of this Agreement is determined to be invalid, void or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement, and the provision in question shall be modified so as to be rendered enforceable.

20. Notices. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by confirmed facsimile or electronic mail if sent during normal business hours of the recipient, if not, then on the next business day; (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) day after deposit with a nationally recognized overnight courier, next day delivery, with verification of receipt. All communications shall be sent to the Association c/o Board President at 5601 Electron Drive, Anchorage, Alaska, 99518 and to Executive at the address set forth below Executive's signature or at such other address as the Association or Executive may designate by ten (10) days' advance written notice to the other party.

21. Arbitration. Any and all disputes arising under this Agreement (with the exception of disputes arising under Sections 6, 7, 8, and 9) shall be submitted to a mutually agreeable arbitrator in Anchorage, Alaska in accordance with the Commercial Rules of the American Arbitration Association then in effect or such other mutually agreeable rules. The arbitration determination resulting from any such submission shall be final and binding upon the parties hereto. Each party intentionally and knowingly waives any and all rights to a trial by jury or by a court of law or equity (except the Association shall be entitled to seek injunctive relief for a violation of Sections 6, 7, 8, and 9 by Executive). Judgment upon any arbitration award may be entered in any court of competent jurisdiction. Each party shall bear his or its own costs, fees and expenses in connection with the arbitration, unless otherwise determined by the arbitrator.

22. Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same document. This Agreement may be signed and/or delivered by facsimile or electronically, which shall be effective as an original for all purposes.

23. Tolling. Should Executive violate any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which Executive ceases to be in violation of such obligation.

24. Section 409A.

(a) This Agreement is intended to comply with Section 409A of the Internal Revenue Code, as amended ("**Section 409A**") and shall be construed accordingly. It is the intention of the parties that payments or benefits payable under this Agreement not be subject to the additional tax or interest imposed pursuant to Section 409A. To the extent such potential payments or benefits are or could become subject to Section 409A, the parties shall cooperate to amend this Agreement with the goal of giving the Executive the economic benefits described herein in a manner that does not result in such tax or interest being imposed; provided, however, that no such amendment shall

materially increase the cost to, or impose any liability on the Association with respect to any benefits contemplated or provided hereunder. Executive shall, at the request of the Association, take any reasonable action (or refrain from taking any action), required to comply with any correction procedure promulgated pursuant to Section 409A.

(b) If a payment that could be made under this Agreement would be subject to additional taxes and interest under Section 409A, the Association in its sole discretion may accelerate some or all of a payment otherwise payable under the Agreement to the time at which such amount is includible in the income of the Executive, provided that such acceleration shall only be permitted to the extent permitted under Treasury Regulation § 1.409A-3(j)(4)(vii) and the amount of such acceleration does not exceed the amount permitted under Treasury Regulation § 1.409A-3(j)(vii).

(c) No payment to be made under this Agreement shall be made at a time earlier than that provided for in this Agreement unless such payment is (i) an acceleration of payment permitted to be made under Treasury Regulation § 1.409A-3(j)(4) or (ii) a payment that would otherwise not be subject to additional taxes and interest under Section 409A.

(d) The right to each payment described in this Agreement shall be treated as a right to a series of separate payments and a separately identifiable payment for purposes of Section 409A.(e). For purposes of Section 4 of this Agreement, "**termination**" (or any similar term) when used in reference to the Executive's employment shall mean "separation from service" with the Association within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code and applicable administrative guidance issued thereunder, and Executive shall be considered to have terminated employment with the Association when, and only when, Executive incurs a "separation from service" with the Association within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code and applicable administrative guidance issued thereunder.

25. Withholding. The Association shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Association to satisfy any withholding tax obligation it may have under any applicable law or regulation.

    IN WITNESS WHEREOF, the parties have duly authorized and caused this Employment Agreement to be executed as of the date first written above.

**Chugach Electric Association Inc**

By: *Hal Halpern*
Hal Halpern (Mar 8, 2022 18:53 CST)
Name: Hal Halpern
Address: 1511 Birkland Road
Two Harbors, MN 55616

By: *Rachel Morse*
Rachel Morse (Mar 8, 2022 18:35 EST)
Name: Rachel Morse
Its: Chair of the Board of Directors

# CEO Contract JK Strategies FINAL CLEAN 2022-02-07

Final Audit Report                                                                 2022-03-09

| | |
|---|---|
| Created: | 2022-03-08 |
| By: | Jill Knittel (jill@jkexec.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAdRq6FFbGvSYPuJSCzh5_DLDqZ1QnSn1y |

## "CEO Contract JK Strategies FINAL CLEAN 2022-02-07" History

- Document created by Jill Knittel (jill@jkexec.com)
  2022-03-08 - 9:29:53 PM GMT- IP address: 66.24.206.121

- Document emailed to Rachel Morse (rachelm@chugachboard.com) for signature
  2022-03-08 - 9:31:16 PM GMT

- Email viewed by Rachel Morse (rachelm@chugachboard.com)
  2022-03-08 - 9:40:28 PM GMT- IP address: 104.28.103.147

- Document e-signed by Rachel Morse (rachelm@chugachboard.com)
  Signature Date: 2022-03-08 - 11:35:40 PM GMT - Time Source: server- IP address: 107.77.236.184

- Document emailed to Hal Halpern (halpern4u@gmail.com) for signature
  2022-03-08 - 11:35:41 PM GMT

- Email viewed by Hal Halpern (halpern4u@gmail.com)
  2022-03-09 - 0:36:00 AM GMT- IP address: 74.125.212.221

- Document e-signed by Hal Halpern (halpern4u@gmail.com)
  Signature Date: 2022-03-09 - 0:53:43 AM GMT - Time Source: server- IP address: 64.188.165.63

- Agreement completed.
  2022-03-09 - 0:53:43 AM GMT

 Adobe Sign